MICHEL, Circuit Judge.
 

 PPG Industries, Inc. appeals the judgment of the United States Court of International Trade holding (1) that substantial evidence supports the United States International Trade Administration’s (ITA) determination that the parties to the suspension agreement did not receive prohibited countervailable Certificados de Devolución de Impuesto (CEDIs) during the period of review, (2) that Fidelicomiso para la Cober-tura de Riesgos Cambiarios (FICORCA) is not a countervailable program because its
 
 *1234
 
 benefits are not provided to a specific enterprise or industry, or group of enterprises or industries, and (3) that no grounds were shown that the suspension agreement must be terminated.
 
 PPG Indus., Inc. v. United States,
 
 712 F.Supp. 195 (CIT 1989) [hereinafter
 
 PPG
 
 //]. Because the Court of International Trade and the ITA did not erroneously construe applicable law, the findings of the ITA are supported by substantial evidence, and the ITA did not abuse its discretion, we affirm.
 

 I. BACKGROUND
 

 On September 16, 1983, PPG filed a petition with the ITA alleging that the Mexican government subsidized the production and export of float glass manufactured in Mexico.
 
 See Unprocessed Float Glass From Mexico,
 
 48 Fed.Reg. 47,039 (Dep’t Comm. 1983) (initiation of investigation). In its petition, PPG identified six programs, including FICORCA
 
 [1]
 
 and CEDI,
 
 [2]
 
 which are at issue in this case, as providing subsidies with respect to Mexican float glass.
 
 Id.
 
 at 47,040.
 

 The FICORCA program is a trust fund set up by the Mexican government and the Bank of Mexico operating through the country’s credit institutions. All Mexican firms with registered debt in foreign currency and payable abroad to Mexican credit institutions or to foreign financial entities or suppliers may purchase, at a controlled rate, the amount in dollars necessary to pay principal on the loan. All loans which are covered by the program must be long-term or be restructured on a long-term basis. The program was terminated December 20, 1982.
 

 Unprocessed Float Glass From Mexico,
 
 49 Fed.Reg. 23,097, 23,099 (Dep’t Comm.1984) (final affirmative countervailing duty determination). Despite the termination of the program, those Mexican companies with foreign debt incurred before December 20, 1982 are eligible to draw from the fund.
 

 The CEDI program issues “CEDIs” which are
 

 tax certificate^] issued by the government of Mexico in an amount equal to a percentage of the f.o.b. value of the exported merchandise or, if national insurance and transportation are used, a percentage of the c.i.f. value of the exported product. The CEDIs are nontransferable and may be applied against a wide range of federal tax liabilities (including payroll taxes, value-added taxes, federal income taxes, and import duties) over a period of five years from the date of issuance.
 

 Unprocessed Float Glass From Mexico,
 
 48 Fed.Reg. 56,095, 56,097 (Dep’t Comm.1983) (preliminary affirmative countervailing duty determination).
 

 The ITA conducted a countervailing duty investigation and preliminarily determined that the Mexican government had bestowed certain countervailable subsidies upon defendant Mexican float glass manufacturers.
 
 Id.
 
 at 56,095. With respect to FI-CORCA, the ITA preliminarily determined that the program was not used during the period of investigation, and with respect to CEDI, the ITA preliminarily determined that the Mexican government had suspended the program.
 
 Id.
 
 at 56,096.
 

 Pursuant to 19 U.S.C. § 1671c(b), the ITA and the two Mexican manufacturers and exporters of float glass to the United States, Vitro Flotado, S.A. (Flotado) and Vidrio Plano de Mexico, S.A. (Plano), entered into a suspension agreement
 
 [3]
 
 in which the Mexican companies agreed to renounce all countervailable benefits from the Mexican government, including any direct or indirect CEDI benefits.
 
 Unpro
 
 
 *1235
 

 cessed Float Glass From Mexico,
 
 49 Fed. Reg. 7264, 7267 (Dep’t Comm.1984) (notice of suspension of countervailing duty investigation).
 

 The suspension agreement includes provisions to assist the ITA in monitoring the Mexican companies’ compliance with the agreement. These provisions require the float glass companies to provide the ITA with any information and documentation the ITA deems necessary to demonstrate compliance.
 
 Id.
 
 at 7268. The agreement also requires the Mexican companies to file certificates of compliance on a regular basis with the ITA.
 
 Id.
 

 At the request of PPG, the ITA continued its countervailing duty investigation despite the suspension agreement.
 
 See
 
 19 U.S.C. § 1671c(g) (1988). In its final determination, the ITA concluded,
 
 inter alia,
 
 that FICORCA was not eountervailable.
 
 Unprocessed Float Glass From Mexico,
 
 49 Fed.Reg. at 23,099. The ITA further determined that Mexico had suspended the CEDI program and that the float glass companies did not use any CEDIs during the period of investigation.
 
 Id.
 
 at 23,100. Additionally, in response to an allegation by PPG that an “extra-CEDI” program existed, the ITA verified that the float glass companies did not receive any such “extra-CEDIs” and concluded that no such program existed.
 
 Id.
 
 at 23,099.
 

 PPG appealed the ITA’s final countervailing duty determination and the execution of the Mexican float glass suspension agreement to the U.S. Court of International Trade, which upheld the decision of the ITA.
 
 PPG Indus., Inc. v. United States,
 
 662 F.Supp. 258, 260 (CIT 1987). PPG then appealed portions of the Court of International Trade’s decision relating to the ITA’s final countervailing duty determination to this court. Although a member of the panel dissented regarding the countervailability of a program not in issue in this appeal,
 
 [4]
 
 the panel unanimously agreed that FICORCA is not eountervailable.
 
 PPG Indus., Inc. v. United States,
 
 928 F.2d 1568, 1578 (Fed.Cir.1991) [hereinafter
 
 PPG
 
 I].
 

 In addition to appealing the ITA’s final countervailing duty determination and the suspension agreement, PPG also requested the ITA to review compliance with the suspension agreement. As a part of its investigation to determine compliance, the ITA submitted several questionnaires to the Mexican government and to the signatories. In response to the questionnaires, the Mexican government indicated that the CEDI program had been suspended on August 25, 1982, and had not been reactivated. The Mexican government also indicated that Fomento de Comercio Exterior (FCE), an export consortium belonging to the Vitro group of companies, did not sell or trade internationally any product, including float glass. The Mexican government further responded that neither Plano nor Flotado had dealings with FCE in connection with sales to the United States.
 

 The ITA later verified these responses by visiting the Mexican agencies responsible for administering these programs, the two signatory companies, and their parent company, Vitro, S.A. The ITA reviewed the financial records and accounts, tax returns and import and export records of both signatory companies, and Vitro, S.A.’s audited financial statements which contained the consolidated records of all firms in the Vi-tro group of companies. Additionally, the ITA verified that the signatories to the suspension agreement did not receive any pass-through CEDI benefits from FCE by confirming that the business relationship between FCE and Flotado and Plano was terminated prior to the signing of the suspension agreement.
 

 During the period of investigation, PPG also requested the ITA to reevaluate the countervailability of the FICORCA program in light of new information it submitted. The new information submitted concerned the number of Mexican firms which participated in the FICORCA program. PPG alleged that the new information es
 
 *1236
 
 tablished that the FICORCA program was countervailable because the Mexican government limited eligibility for the FICOR-CA program to companies with long term foreign debt incurred before December 20, 1982, and that, as a result of these eligibility requirements, only a small portion of Mexican companies was eligible to participate in the program.
 

 Based on its investigation and verification, the ITA finally determined that the Mexican signatories had complied with the suspension agreement.
 
 [5]
 

 Unprocessed Float Glass From Mexico, 51
 
 Fed.Reg. 44,-503 (Dep’t Comm.1986) (final results Of countervailing duty administrative review). Specifically, the ITA found that neither Flotado nor Plano benefitted from CEDIs directly. Additionally, because the float glass producers had ended their relationship with FCE in January 1984, the signatories did not receive any pass-through CEDI benefits from FCE.
 
 Id.
 
 at 44,504. The ITA also rejected PPG’s assertion that the new evidence submitted by PPG required Commerce to reach a different conclusion regarding the countervailability of the FICORCA program. The ITA again concluded that the FICORCA program is not countervailable.
 
 Id.
 

 PPG appealed this final determination to the Court of International Trade. The Court of International Trade held,
 
 inter alia,
 
 that substantial evidence supports the ITA’s determination that the parties to the suspension agreement did not receive coun-tervailable CEDIs or extra-CEDIs (directly or indirectly) during the period of review and that FICORCA is not countervailable because it is not limited,
 
 de facto,
 
 to a specific enterprise or industry, or group of enterprises or industries.
 
 PPG II,
 
 712 F.Supp. at 201. Additionally, by affirming the ITA’s determinations regarding FI-CORCA and CEDIs, the Court of International Trade implicitly held that the ITA acted properly by not terminating the suspension agreement. The present appeal is from that decision.
 

 II. STATEMENT OF ISSUES
 

 1. Does substantial evidence support the ITA’s determination that the parties to the suspension agreement did not receive countervailable CEDIs during the period of review?
 

 2. Does substantial evidence support the ITA’s determination that FICORCA does not provide benefits to a specific enterprise or industry, or group of enterprises or industries and is therefore not coun-tervailable?
 

 3. Does substantial evidence support the ITA’s decision not to terminate the suspension agreement and was its decision within the limits of its discretion?
 

 III. STANDARD OF REVIEW
 

 In reviewing the ITA’s determination, the Court of International Trade was guided by the standard of review set forth in 19 U.S.C. § 1516a(b)(1) (1988). That section provides that the . Court of International Trade “shall hold unlawful any determination, finding, or conclusion found — (B) ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.” 19 U.S.C. § 1516a(b)(1). To determine whether the Court of International Trade correctly applied that standard in reaching its decision, this court must apply anew the statute’s express standard of review to the agency’s, determination.
 
 Atlantic Sugar, Ltd. v. United States,
 
 744 F.2d 1556, 1559 (Fed.Cir.1984). Therefore, we must affirm the Court of International Trade unless we conclude that the ITA’s determination is not supported by substantial evidence or is otherwise not in accordance with law.
 

 Substantial evidence is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”
 
 Matsushita Elec. Indus. Co., Ltd. v. United States,
 
 750 F.2d 927, 933 (Fed.Cir.1984) (quoting
 
 Consolidated Edison Co. v. NLRB,
 
 305 U.S. 197, 229, 59 S.Ct. 206, 216,
 
 *1237
 
 83 L.Ed. 126 (1938)). “[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency’s finding from being supported by substantial evidence.”
 
 Id.
 
 (quoting
 
 Consolo v. Federal Maritime Comm’n,
 
 383 U.S. 607, 619-20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). “[T]he question is whether there [is] evidence which could reasonably lead to the [agency’s] conclusion.”
 
 ICC Indus., Inc. v. United States,
 
 812 F.2d 694, 698 (Fed.Cir.1987) (quoting
 
 Matsushita,
 
 750 F.2d at 933).
 

 IV. ANALYSIS
 

 A. CEDIs
 

 PPG argues that the ITA’s conclusion that neither Flotado nor Plano received CEDIs directly or indirectly is not supported by substantial evidence. In support of its argument, PPG points to evidence of record that arguably shows that payments were made under the CEDI program after its alleged suspension date and that such payments were received by members of the Vitro group, including FCE. PPG also points to evidence that arguably shows that payments were made under the “extra-CEDI” program to FCE, after the alleged suspension date of the CEDI program.
 

 Even if such evidence does suggest that FCE received CEDI or extra-CEDI benefits after the alleged suspension date, it does not negate the fact that substantial evidence in the record shows that neither Flo-tado nor Plano received any CEDI benefits, directly or indirectly via FCE, during the period of review. Because we are reviewing compliance with the suspension agreement, to which only Flotado and Plano are parties, the relevant inquiry is whether or not they received any benefits during the period of review, not whether any other member of the Vitro group or FCE received benefits. The Mexican government’s responses to the questionnaires submitted to it indicated that neither Flotado nor Plano received CEDI or extra-CEDI benefits directly or indirectly. The Mexican government also indicated that neither Flotado nor Plano had any dealings with FCE, and therefore FCE did not pass any benefits through to either Flotado or Plano. As set forth in the “BACKGROUND” section, the ITA conducted a thorough verification of all of the information it received from the Mexican government and the signatories. The ITA’s conclusion that neither Flotado nor Plano received any CEDI benefits is, we conclude, supported by substantial evidence.
 

 PPG also points to a Plano tax return which shows an amount listed under “CEDI” to show that Plano received CEDI benefits after the CEDI program was supposedly terminated. In its investigation to determine compliance with the suspension agreement, the ITA learned that the amount listed under “CEDI” was not a CEDI of the type proscribed by the terms of the suspension agreement, but was actually a duty drawback.
 
 [6]
 
 Because compliance with the terms of the suspension agreement is all that was being reviewed, the ITA properly concluded that the duty drawback entry was of no moment.
 
 [7]
 

 Finally, PPG argues that the ITA applied the wrong legal test in making its determination regarding CEDIs.
 
 [8]
 
 In particular, PPG argues that the ITA should not have ignored the fact that payments were received by other members of the Vitro group, including FCE, because the focus of the countervailing duty law is upon the bestowal of a bounty or grant upon
 
 merchandise
 
 exported to the United States, not
 
 *1238
 
 the identity of the recipient of the bounty.
 
 [9]
 
 Because 19 U.S.C. § 1303(a)(1) requires, countervailing duties to be imposed if a product is subsidized, PPG argues that the ITA should have investigated whether the product was subsidized through other members of the Vitro group or FCE,
 
 i.e.,
 
 whether benefits were received by other members of the Vitro group or FCE.
 

 The United States and the float glass manufacturers argue that section 1303(a)(1) must be read in conjunction with section 1671c(b) which authorizes suspension agreements
 

 if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree — (1) to eliminate the subsidy completely____
 

 19 U.S.C. § 1671c(b). In this case, the exporters who account for substantially all of the imports are signatories to the agreement. It was they who agreed to eliminate the subsidies completely. The suspension agreement itself states that Flotado and Plano are the only known manufacturers and exporters of float glass and that they account for over 85 percent of the exports from Mexico to the United States.
 
 Unprocessed Float Glass From Mexico,
 
 49 Fed. Reg. at 7267. Therefore, in reviewing compliance with the suspension agreement, it was appropriate for the ITA to first confirm that these two producers continue to account for substantially all Mexican float glass exports to the United States and then to investigate whether they received any benefits during the period of review.
 
 [10]
 
 So long as it can establish that no benefits were indirectly passed to the signatories, it was not necessary for the ITA to investigate whether benefits were received by other members of the Vitro group or FCE.
 

 PPG argues that the Mexican government provided inaccurate information to the ITA regarding the status of the CEDI program and the extra-CEDI program and regarding FCE’s involvement in the sale or trade of float glass. PPG concludes, therefore, that the ITA’s investigation was inadequate. Because the facts and allegations cited by PPG in support of its contentions do not cast doubt on the weight of the evidence supporting the ITA’s conclusion that the signatories to the suspension agreement did not receive CEDI benefits, the ITA did not abuse its discretion by failing to investigate further. At best, the facts cited by PPG raise questions as to whether any other members of the Vitro group of companies received CEDI benefits. As explained above, the relevant inquiry is whether the signatories to the suspension agreement received benefits. Because neither FCE nor any other member of the Vitro group passed benefits indirectly to the signatories, whether they themselves in fact received benefits is irrelevant.
 

 Furthermore,
 
 PPG I
 
 reiterated well-settled precedent that “the Secretary of Commerce through the ITA has been given great discretion in administering the countervailing duty laws.”
 
 PPG I,
 
 928 F.2d at 1571.
 
 Cf. Melamine Chem., Inc. v. United States,
 
 732 F.2d 924, 929 (Fed.Cir.1984) (“Congress has afforded Commerce considerable latitude and discretion in implementing the antidumping duty laws.”). This includes the discretionary authority to determine the extent of investigation and information it needs in order to determine whether a respondent received any countervailable benefit.
 
 See Monsanto Co. v. United States,
 
 698 F.Supp. 275, 283 (CIT
 
 *1239
 
 1988) (declining to order the ITA to conduct further investigation). Therefore, for this court to reverse and remand for further investigation, PPG would have to show that the ITA abused its discretion in not conducting further investigation. PPG has not even shown that the alleged inaccurate information addresses the issue at hand,
 
 i.e.,
 
 receipt of benefits by either Flotado or Plano, or that it casts doubt on the reasonableness of the ITA’s conclusions,
 
 i.e.,
 
 that neither Flotado nor Plano received any benefits. Accordingly, PPG has not shown that the ITA abused its discretion in declining to investigate further.
 

 We conclude that substantial evidence supports the ITA’s finding that neither Plano or Flotado received CEDI or extra-CEDI benefits directly or indirectly and that the ITA utilized the proper legal test in reaching this conclusion.
 

 B. FICORCA
 

 The United States initially argues that the doctrine of issue preclusion bars this court from relitigating the holding in
 
 PPG I
 
 that the FICORCA program is not countervailable. The Court of International Trade set forth the proper test for determining when issue preclusion should take effect.
 
 PPG II,
 
 712 F.Supp. at 199. In particular, the defendant must show:
 

 (i) the issue previously adjudicated is identical with that now presented,
 

 (ii) that issue was “actually litigated” in the prior case,
 

 (iii) the previous determination of that issue was necessary to the end-decision then made, and
 

 (iv) the party precluded was fully represented in the prior action.
 

 Thomas v. General Servs. Admin.,
 
 794 F.2d 661, 664 (Fed.Cir.1986). Because the factual record regarding FICORCA is different in the instant case,
 
 [11]
 
 the Court of International Trade correctly concluded that “there has not been a sufficient demonstration that the issues sought to be precluded as previously adjudicated are identical with the issues now presented.”
 
 PPG II,
 
 712 F.Supp. at 199.
 

 That is not to say, however, that the new information in the record materially affects or contradicts any fact-findings upon which this court relied in deciding that the FI-CORCA program is not countervailable. Indeed, to the extent that the new information does not materially affect the basis of this court's decision in
 
 PPG I,
 
 this court must follow its prior decision.
 
 See Zenith Radio Corp. v. United States,
 
 783 F.2d 184, 186 n. 3 (Fed.Cir.1986) (recognizing that under the procedures of this court a decision by a prior panel is binding precedent upon another panel).
 

 In the instant case, the Court of International Trade upheld the ITA’s determination that FICORCA is not countervailable because its benefits are not provided to a specific enterprise or industry, or group of enterprises or industries.
 
 PPG II,
 
 712 F.Supp. at 201. In order to determine whether a domestic subsidy received by a foreign producer from its government is countervailable, the two-part specificity test established in prior cases and restated in
 
 PPG I
 
 must be satisfied:
 

 If the domestic subsidy is provided by its terms to a particular enterprise or industry or group of enterprises or industries, it is countervailable without further inquiry. If the benefit appears by its terms to be nominally generally available to all industries, the benefit may nevertheless be countervailable if,
 
 in its application,
 
 the program results in a subsidy only to a specific enterprise or industry or specific group of enterprises or industries.
 

 PPG I,
 
 928 F.2d at 1576 (emphasis in original).
 
 See id.
 
 at 1580-81 (Michel, J., dissenting). At least three factors must be considered on a case-by-case basis to determine whether a program is specific in its
 
 *1240
 
 application. First, the ITA must consider the extent to which the foreign government acted to limit availability of the program. Second, the ITA must consider the number of enterprises or industries which actually use the program. Third, the ITA must consider the extent to which the foreign government exercises discretion in making the program available.
 
 PPG I,
 
 928 F.2d at 1576.
 
 [12]
 

 PPG argues that this court’s holding in
 
 PPG I
 
 that FICORCA is not countervaila-ble should not be followed because the new information PPG submitted shows that FI-CORCA is countervailable. In particular, PPG alleges that the statistical information it submitted shows that FICORCA is specific to a given industry. The ITA did not agree, however, and held that the “new information does not change the Department’s understanding of the operation of the program or the reasoning that led to [its] decision in the final determination.”
 
 Unprocessed Float Glass From Mexico,
 
 51 Fed.Reg. 37,319, 37,321 (Dep’t Comm.1986) (preliminary results of countervailing duty administrative review). In its final determination, the ITA stated: “As we stated in our preliminary results, we reviewed the information presented by PPG and continue to uphold our determination that the FICORCA program is not countervailable.”
 
 Unprocessed Float Glass From Mexico,
 
 51 Fed.Reg. at 44,504. Because this determination is supported by substantial evidence and is not otherwise contrary to law, it must be upheld.
 

 The new information submitted by PPG concerned specific data on the number of Mexican companies which participated in the FICORCA program. This new information does not establish that the program benefited a discrete, selective, targeted industry, but only that not all Mexican companies were eligible to participate in the FICORCA program. However, the eligibility requirements and the number of companies participating were already investigated by the ITA in its original investigation. The ITA was aware that the Mexican government limited eligibility for the FICOR-CA program to companies with, long term foreign debt incurred before December 20, 1982, and that, as a result of these eligibility requirements, only a small portion of Mexican companies was eligible to participate in the program. 51 Fed.Reg. at 37,-321. The ITA was also aware that the Mexican government possessed the means to identify the Mexican companies which would be eligible to enroll in the program.
 
 Id.
 

 The Commerce Department found that the firms that received FICORCA benefits represented a wide variety of industries.
 
 Id.
 
 PPG has never disputed this finding, and the new information does not negate this finding. With respect to the first factor, access to the program, PPG argues that the terms of the program were drafted so that only approximately 3.5 percent of all Mexican companies were eligible for the benefits, and that the Mexican government knew in advance which companies would be eligible to participate. Without more, however, these facts are insufficient to show countervailability.
 

 The one-judge opinion in
 
 PPG I
 
 supporting affirmance stated that the “existence of eligibility requirements does not suffice to identify a discrete class which has been afforded benefits of a ‘bounty or grant.’ ”
 
 PPG I,
 
 928 F.2d at 1578. Because eligibility requirements always serve to .limit participation in any given program and may do so indiscriminately, something more must be shown to prove that the program benefits only a specific industry or group of industries. Similarly, although the actual number of eligible firms must be considered, it is not controlling. Instead, the actual make-up of the eligible firms must be evaluated. This analysis determines
 
 *1241
 
 whether those firms comprise a specific industry or group of industries.
 

 Likewise, in
 
 PPG I
 
 it was noted that [njothing in the statute mandates PPG’s interpretation that specificity is met merely if recipients of a domestic subsidy are identifiable____ The statute does not mandate that “specific” means no more than “identifiable.”
 

 Id.
 
 at 1577. The fact that the Mexican government could identify which companies would be eligible to participate is of no consequence unless the companies identified fall within the same industry or group of industries.
 

 With respect to the second factor, the number of beneficiaries, PPG argues that the new information shows that the benefits were distributed disproportionately. In particular, PPG argues that the fact that only nine companies received over 50 percent of the benefits, that 23 companies received over 60 percent of the benefits, and that the Vitro group alone accounted for eight percent of all refinancings shows that the program is specific. Notwithstanding these figures, however, nowhere does PPG even allege that FICORCA is specific to the float glass industry or to some other broader group of industries into which float glass could be categorized.
 

 Additionally, while high concentrations of beneficiaries in a given industry must be considered, PPG’s new evidence does not show a high concentration in a given industry but quite the opposite. If only 60 percent of the benefits are received by 23 companies in varying industries, one can only imagine the number and variety of companies which receive the remaining 40 percent of the benefits. Additionally, although PPG has shown that eight percent of the FICORCA benefits are provided to the Vitro group of companies, PPG has not shown that any of the other recipients are in the float glass industry or some broader industrial grouping in which float glass could be categorized.
 

 Finally, with respect to the third factor, governmental discretion, PPG argues that the Mexican government allowed the Vitro group and other companies to enroll commercial paper in FICORCA and to enroll debt for which rescheduling to long term debt had not been completed. Despite PPG’s assertion, however, neither of these facts reflects the exercise of the relevant kind of governmental discretion. As the United States notes in its brief, FICORCA has always provided for the enrollment of commercial paper. The only requirement for participation is indebtedness denominated in a foreign currency and payable abroad to Mexican credit institutions or to foreign financial entities or suppliers.
 
 Unprocessed Float Glass From Mexico,
 
 49 Fed.Reg. at 23,099. Because commercial paper can satisfy these general and objective criteria, enrollment of commercial paper does not evidence the exercise of governmental discretion. With respect to debt for which rescheduling had not been completed, the ITA found during verification that the debt enrolled by Flotado and Plano was in fact long term loans, and therefore, did not need to be rescheduled. As such, no discretion was exercised in waiving prior rescheduling.
 

 Therefore, the new information submitted by PPG does not negate or cast substantial doubt on the conclusions reached by the ITA in its analysis of the specificity factors. Commerce’s determination that the companies that received FICORCA benefits represented a wide variety of industries is supported by substantial evidence.
 

 PPG additionally alleged that if the new information that it submitted did not show specificity, at the very least, it required the ITA to further investigate the program. PPG argues that the ITA’s own practice requires it to obtain certain information before making a determination. PPG concludes therefore, that if this court does not find FICORCA to be specific, it should at least remand with instructions to the ITA to obtain the information necessary to make an informed determination regarding FICORCA.
 

 PPG argues that the ITA should have first examined the statute creating the program and the regulations implementing it to determine if it is specific on its face. PPG notes that neither the statute nor the
 
 *1242
 
 regulations is in the record of this case. PPG argues that the ITA did not address FICORCA in its questionnaires to the Mexican government, that the ITA did not request any information from the Mexican government regarding actual participation in the FICORCA program, and that the ITA did not review criteria applied by the Mexican government for participation in the program. PPG states that the record does not contain information regarding the three primary factors which must be considered to determine specificity and to make a countervailing duty determination.
 

 Where PPG’s argument goes astray, however, is in assuming that the ITA’s determination as to FICORCA in this review is based on a “clean slate.” It is not. The FICORCA program was considered in
 
 PPG I.
 
 Indeed, this court upheld the ITA’s
 
 de facto
 
 benefit analysis of FICORCA in
 
 PPG I.
 
 928 F.2d at 1578.
 
 See supra
 
 note 4 and accompanying text. The record in that case includes all of the information that PPG alleges to be missing and necessary to a determination in the present case. In that case, the ITA investigated the eligibility requirements and the extent of company participation in the FICORCA program.
 

 Additionally, the ITA has a longstanding administrative practice of not reinvestigating a program determined not to be countervailable unless the petitioner presents new evidence justifying reconsideration of a prior finding.
 
 See, e.g., PPG Indus., Inc. v. United States,
 
 746 F.Supp. 119, 135 (CIT 1990) (holding that “it was reasonable for Commerce to not investigate FICORCA” in an investigation regarding fabricated automotive glass based on the Court of International Trade’s determination regarding FICORCA in
 
 PPG I),
 
 appeal filed August 28, 1991;
 
 Can-Am Corp. v. United States,
 
 664 F.Supp. 1444, 1449 (CIT 1987) (holding that “Commerce’s decision not to reinvestigate is reasonable and in accordance with law”);
 
 Oil Country Tubular Goods from Argentina,
 
 56 Fed.Reg. 38,116, 38,120 (Dep’t Comm.1991) (final results of countervailing duty administrative reviews) (stating that “[i]t is the Department’s practice not to reinvestigate a program absent specific information indicating that there were changes in the program sufficient to warrant reinvestigation”);
 
 Fresh, Chilled, and Frozen Pork from Canada,
 
 54 Fed. Reg. 5537, 5539 (Dep’t Comm.1989) (initiation of countervailing duty investigation) (declining to initiate a reinvestigation on several programs because the petitioners did not provide any new evidence or allege changed circumstances with respect to those programs);
 
 Fabricated Automotive Glass from Mexico,
 
 50 Fed.Reg. 1906, 1909 (Dep’t Comm.1985) (final affirmative countervailing duty determination and countervailing duty order) (stating that “[ajbsent new evidence or changed circumstances, [the ITA does] not reinvestigate programs found not to be countervailable in earlier investigations”);
 
 Certain Iron-Metal Castings from India,
 
 48 Fed.Reg. 56,092, 56,093 (Dep’t Comm.1983) (final results of administrative review of countervailing duty order) (stating that “[a]bsent new evidence that the nature of these other activities has changed, the Department will not reinvestigate these same areas”). And as explained
 
 supra,
 
 the ITA has been given great discretion in administering the countervailing duty laws. This discretionary authority certainly extends to deciding whether to reinvestigate a program previously found not to be countervailable in a final agency determination.
 
 PPG Indus., Inc.,
 
 746 F.Supp. at 135 (“Commerce has discretion in deciding whether to reinvesti-gate a program previously found not coun-tervailable in a final agency determination; in reaching its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice.”).
 

 Because the allegedly new information submitted by PPG was previously considered by the ITA
 
 (i.e.,
 
 the eligibility requirements and the extent of company participation) and because the allegedly new information does not cast substantial doubt on the ITA original determination, the ITA’s conclusion that the new evidence submitted did not justify a further investigation in this review cannot be an abuse of discretion and, therefore, must be affirmed.
 

 
 *1243
 
 C. Termination of Suspension Agreement
 

 In response to PPG’s assertion that the suspension agreement should be terminated, the ITA concluded:
 

 We found that the signatories to the suspension agreement complied with the terms of the agreement during the period of review. Since the agreement has resulted in the elimination of all bounties or grants on float glass exports to the United States, it continues to be in the public interest. Therefore, there is no basis for terminating the agreement and issuing a countervailing duty order.
 

 Unprocessed Float Glass From Mexico,
 
 51 Fed.Reg. at 44,504.
 

 On appeal, PPG argues that the ITA should have terminated the suspension agreement because it does not satisfy the statutory requirements that the agreement eliminate the subsidy completely, 19 U.S.C. § 1671c(b), that the agreement be susceptible to “effective monitoring,” 19 U.S.C. § 1671c(d)(11)(B), and that the agreement be in the public interest of the United States, 19 U.S.C. § 1671c(d)(1)(A).
 

 With respect to the first statutory requirement, PPG points to the alleged receipt of CEDI benefits to show that the subsidy has not been eliminated completely. Because Commerce’s determination that neither Flotado nor Plano received any countervailable subsidies in contravention of the suspension agreement is supported by substantial evidence and is not otherwise contrary to law, as set forth above in section IV.A., we do not find this argument persuasive.
 

 With respect to the second requirement, PPG argues that the ITA cannot monitor compliance because:
 

 The Mexican government and the Mexican float glass producers failed to provide the information the ITA needed to resolve ... discrepancies____ [T]he agency was unable to inform itself accurately of even some of the most basic facts regarding a program covered by the suspension agreement. Moreover, in the presence of such gaps of information, the Mexican government repeatedly ignored the ITA’s requests for informa-tion____ The Mexican government’s lack of cooperation in this regard establishes that the ITA cannot rely upon the Mexican government to provide it with complete and accurate information regarding the CEDI program and compliance with the suspension agreement.
 

 PPG has not substantiated these blanket assertions of lack of cooperation and incomplete responses, however, with anything which shows that the review of the suspension agreement was incomplete or produced inaccurate results regarding any
 
 material
 
 information. Instead, the record shows that the ITA’s investigation was thorough and that the ITA verified all responses received by the Mexican government.
 

 Moreover, the suspension agreement contains monitoring provisions requiring,
 
 inter alia,
 
 the float glass companies to provide the ITA with any information and documentation the ITA deems necessary to demonstrate compliance. 49 Fed.Reg. 7264, 7268. During the period of review, the Mexican companies complied fully with the monitoring provisions by providing both responses that met with ITA standards and certifications of compliance. PPG makes these same arguments with respect to the third requirement, that is, that the suspension agreement is not in the public interest because it “does not cover all subsidies and ... effectively rewards the Mexican government for concealing information regarding a key program covered by the agreement.” Once again, because substantial evidence shows that the subsidies (CEDIs) were eliminated completely and that the ITA is able to monitor the agreement effectively, the ITA’s determination that the agreement is in the public interest and should not have been terminated is reasonable.
 

 Accordingly, the ITA properly considered each of the three statutory requirements. Because its decision not to terminate the suspension agreement clearly satisfies the substantial evidence standard set forth in the statute, 19 U.S.C. § 1516a(b)(1), is reasonable and is otherwise in accordance with law, it must be affirmed.
 

 
 *1244
 
 V. CONCLUSION
 

 Substantial evidence supports the ITA’s determination that the parties to the suspension agreement did not receive counter-vailable CEDIs during the period of review, that FICORCA is not a countervailable program because it is not provided to a specific enterprise or industry, or group of enterprises or industries, that no further investigation of these programs was warranted, and that the suspension agreement should not be terminated. In addition, those determinations were based on proper legal tests and were otherwise in accordance with law.
 

 AFFIRMED.
 

 [1]
 

 . FICORCA is the acronym for "Fidelicomiso para la Cobertura de Riesgos Cambiarios” (Trust Fund for the Coverage of Exchange Risks).
 

 [2]
 

 . CEDI is the acronym for “Certificado de Devo-lución de Impuesto” (Tax Certificate Program).
 

 [3]
 

 . Section 1671c(b) authorizes suspension agreements
 

 if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree — (1) to eliminate the subsidy completely____
 

 19 U.S.C. § 1671c(b) (1988).
 

 [4]
 

 . The dissent disagreed on the application of the specificity test to the natural gas pricing policy because ITA failed to investigate disproportionate impact on glass makers. 928 F.2d 1568, 1581 (Fed.Cir.1991) (Michel, J., dissenting),
 

 [5]
 

 . The ITA had preliminarily reached this same conclusion. The ITA's preliminary determination is reported at 51 Fed.Reg. 37,319 (1986).
 

 [6]
 

 . A duty drawback is a rebate on import duties paid on imported raw materials incorporated in export products.
 
 See
 
 19 U.S.C. § 1313 (1988).
 

 [7]
 

 . Whether or not the duty drawback was excessive, thus requiring the imposition of countervailing duties, is not an issue in this appeal.
 

 [8]
 

 . The United States and the float glass manufacturers argue that this argument should not be considered because it is raised for the first time on appeal.
 
 See Hormel v. Helvering,
 
 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). However, because the record shows that the issue was raised before the CIT, we must consider the argument.
 

 [9]
 

 . 19 U.S.C. § 1303(a)(1) provides:
 

 [W]henever any country ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ... then upon the importation of such article or merchandise into the United States ... there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.
 

 19 U.S.C. § 1303(a)(1) (1988).
 

 [10]
 

 . PPG's assertion that "[t]he identify to the recipient of the bounty is irrelevant" is without merit, if it means that an exporter totally unrelated to the recipient of the bounty could be required to pay a countervailing duty.
 

 [11]
 

 . The time period under review in
 
 PPG I
 
 was January 1 to September 30, 1983.
 
 PPG I,
 
 928 F.2d at 1570. The time period under review in the instant case is February 1, 1984 through December 31, 1985.
 
 Unprocessed Float Glass From Mexico,
 
 51 Fed.Reg. at 44,503. Moreover, in the instant case, PPG submitted additional statistical information which was not considered in
 
 PPG I.
 

 [12]
 

 . Both the one-judge opinion supporting affir-mance and dissent in
 
 PPG I
 
 (the third panel member joined neither opinion but concurred in the result of affirmance) agreed that the specificity test, including consideration of these factors, is the proper test for determining coun-tervailability. 928 F.2d at 1576 (opinion of Chief Judge Nies) & 1580-81 (Michel, J., dissenting). The dissent, however, would hold that in assessing such factors, the court must consider not only government action or intent, but disproportionate impact.
 
 Id.
 
 at 1580.